# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

OLIVER LUCIEN GARR,
    Petitioner,

    vs.

WARDEN, DAYTON
CORRECTIONAL INSTITUTION,
    Respondent.

Civil Action No. 1:08-cv-293

Dlott, C.J.
Litkovitz, M.J.

**REPORT AND
RECOMMENDATION**

Petitioner is an Ohio prisoner currently incarcerated at the Dayton Correctional Institution

in Dayton, Ohio. In April 2008, he filed a *pro se* petition for writ of habeas corpus pursuant to 28

U.S.C. § 2254 challenging his 2006 conviction in the Hamilton County, Ohio, Court of Common

Pleas as a major drug offender on a cocaine trafficking charge. The matter was stayed pending the

Ohio Supreme Court's consideration of an unresolved state-law question in accordance with a

Certification Order issued by the District Court. (Docs. 28-29). On June 8, 2010, the Ohio Supreme

Court answered the certified state-law question in a published decision, *Garr v. Warden, Madison*

*Corr. Inst.,* 933 N.E.2d 1063 (Ohio 2010), and on June 16, 2010, the instant action was reinstated.

(Doc. 33). Thereafter, the parties were allowed to supplement the record with additional pleadings

and exhibits. (Docs. 34-37, 39). At this juncture, it appears that the record is complete, and the case

is ripe for final disposition of petitioner's claims for federal habeas corpus relief.

## I. PROCEDURAL HISTORY

The procedural background of this case in the state courts already has been discussed in detail

in a prior Report and Recommendation filed on March 2, 2009, which is incorporated by reference

herein. (*See* Doc. 14, pp. 1-5). Essentially, petitioner was convicted after a jury trial on one count

of drug trafficking in violation of Ohio Rev. Code § 2925.03(A)(1) and an attached major drug offender (MDO) specification; the jury specifically found petitioner guilty of trafficking in cocaine "in an amount that equaled or exceeded 1000 grams," which is a first-degree felony and MDO offense under the enhanced penalty provision set forth in Ohio Rev. Code § 2925.03(C)(4)(g). (Doc. 6, Exs. 1, 4).[1] Petitioner was sentenced to a ten-year mandatory prison term. (Doc. 6, Ex. 5).

On direct appeal, petitioner raised claims challenging the sufficiency of evidence supporting his conviction as a major drug offender on both the trafficking charge and the specification. (Doc. 6, Ex. 6). Petitioner contended that in the absence of any "evidence of a detectable amount of cocaine, or substance containing cocaine as the subject of the offer to sell" to establish "either identity or weight of the drug involved, ... the jury's verdict supports only a conviction for offer to sell as a felony of the fifth degree." (Doc. 6, Ex. 6).

On July 6, 2007, the Ohio Court of Appeals overruled the assignments of error and affirmed the trial court's judgment. (Doc. 6, Ex. 8). Petitioner's counsel appealed to the Ohio Supreme Court, but the state supreme court denied leave to appeal and summarily dismissed the appeal "as not involving any substantial constitutional question." (Doc. 6, Exs. 9, 11).

After unsuccessfully pursuing state post-conviction remedies and an application for reopening of the direct appeal as a *pro se* litigant (*see* Doc. 6, Exs. 12, 15, 16, 18, 22, 27), petitioner filed the instant federal habeas petition. He alleges two grounds for relief:

**Ground One:** The State of Ohio failed to present sufficient evidence to the jury to prove that Mr. Garr was a Major Drug Offender under Ohio law because no evidence was presented as to the weight or identity of the drug involved in the Trafficking Offense to which the Major Drug Offender attached.

---

[1]Petitioner also was charged in a second count with engaging in a pattern of corrupt activity in violation of Ohio Rev. Code § 2923.32(A)(1). (Doc. 6, Ex. 1). The jury acquitted petitioner of that offense, as well as additional drug possession, trafficking and conspiracy offenses charged in another indictment based on a separate incident. (*See* Doc. 6, Ex. 4; Doc. 13, Tr. 891-92).

**Ground Two:** Under Ohio law, an Offer to Sale is a felony of the Fifth-Degree only punishable by 6-12 months, if the State of Ohio cannot prove beyond a reasonable doubt that the substance actually contained/involved a mixture of identifiable amount of cocaine exceeding the weight limits provided under Ohio ... law for a more serious offense.

(Doc. 1, pp. 6, 8).

### Stay of Case and Certification of State-Law Question

In response to the petition, respondent filed a motion to dismiss, arguing that the two grounds for federal habeas relief "are not cognizable because both grounds relate to a state law question interpreting a state statute, R.C. 2925.03(C)(4)(g)." (Doc. 6, p. 8).

On March 2, 2009, the magistrate judge issued a Report and Recommendation to deny the motion to dismiss, reasoning that "the ultimate question whether the evidence presented was sufficient to establish beyond a reasonable doubt the elements of the offense and penalty as defined by state-law [is] of constitutional dimension and thus within the federal habeas court's authority to address." (Doc. 14, p. 7). The magistrate judge went on to examine the merits of petitioner's sufficiency-of-evidence claims and determined that an unresolved issue of Ohio law, which posed a close question critical to the resolution of the federal habeas petition, had arisen in the wake of the Ohio Supreme Court's decision in *State v. Chandler,* 846 N.E.2d 1234 (Ohio 2006).

In *Chandler,* the Ohio Supreme Court upheld the defendants' cocaine trafficking convictions, because "a person can be convicted for offering to sell a controlled substance in violation of R.C. 2925.03(A)(1) without actually transferring a controlled substance to the buyer." *Chandler,* 846 N.E.2d at 1236-37 (citing *State v. Patterson,* 432 N.E.2d 802, syllabus (Ohio 1982) (*per curiam*)). However, the court concluded that under the "clear" language of the penalty statute for trafficking offenses, Ohio Rev. Code § 2925.03(C)(4), "a substance offered for sale must contain some detectable amount of the relevant controlled substance before a person can be sentenced as a major

drug offender under R.C. 2925.03(C)(4)(g)." *Id.* at 1238-39.

In *Chandler*, evidence was presented demonstrating that the substance offered for sale was actually baking soda containing no detectable amount of cocaine. *Id.* Upon review of the case-law in the aftermath of *Chandler,* the magistrate judge concluded in this case that "no state court, including the Ohio Court of Appeals in the instant case, has directly considered the state-law issue posed herein – *i.e.*, whether *Chandler* extends to prohibit a conviction for a first-degree-felony cocaine-trafficking offense and mandatory ten-year sentence under the enhanced penalty provision of Ohio Rev. Code § 2925.03(C)(4)(g), where the actual substance offered for sale is never recovered for purposes of establishing a detectable amount of cocaine, but also no affirmative evidence is presented to cast doubt on the petitioner's representations to the informant regarding the identity and weight of the substance or to otherwise refute the jury's finding that the substance offered for sale was cocaine in 'an amount that did equal or exceed 1000 grams.'" (Doc. 14, pp. 22-23). In the interest of comity, the magistrate judge recommended that the unresolved state-law question be certified to the Ohio Supreme Court to answer and that the instant action be stayed pending the state supreme court's consideration of the certified question. (Doc. 14, pp. 24-25).

On June 29, 2009, the District Court adopted the Report and Recommendation to deny respondent's motion to dismiss and to certify the unresolved state-law question to the Ohio Supreme Court, as modified in accordance with respondent's specific objections and suggestion that the question be "reframed." (Doc. 28). The District Court stayed the instant action "pending the Ohio Supreme Court's consideration of the following state law question:"

> Whether the Supreme Court of Ohio's decision in ... *Chandler* ..., as described in the syllabus of the court, to wit: "[a] substance offered for sale must contain some detectable amount of the relevant controlled substance before a person can be sentenced as a major drug offender under R.C. § 2925.03(C)(4)(g)," extends to cases where the substance offered for sale was never observed, tested, or recovered to

4

> ascertain whether it contained a detectable amount of the controlled substance, but
> no affirmative evidence was presented to call into question the defendant's
> representation in his offer to sell, or to refute the jury's factual finding, that the
> substance was in fact a controlled substance in an amount that equaled or exceeded
> 1000 grams.

(Doc. 28, p. 2).

The District Court issued a Certification Order, which was filed with the Ohio Supreme

Court in Case No. 2009-1323 on July 22, 2009. (Doc. 29; *see also* Doc. 33, pp. 1-2). Nearly a year

later, on June 8, 2010, the Ohio Supreme Court issued a published decision answering the certified

question "in the negative and clarify[ing] that our holding in *Chandler* does not extend to cases

where a substance offered for sale is not recovered or tested in order to ascertain whether it contains

a detectable amount of a controlled substance." *Garr v. Warden, Madison Corr. Inst.,* 933 N.E.2d

1063, 1064 (Ohio 2010). The court reasoned in pertinent part:

> Garr urges that *Chandler* applies to the facts in his case, arguing that because the
> state did not recover any of the drugs he offered to sell, it cannot prove that the drugs
> contained "some detectable amount" of cocaine.... He maintains that the state's
> evidence against him is insufficient to support a first-degree felony conviction and
> that, pursuant to *Chandler,* he may not be sentenced as a major drug offender to a
> mandatory ten-year prison term. He also points out that some Ohio appellate courts
> have applied *Chandler* in offer-to-sell cases where the offered substance was never
> recovered or tested. See *State v. Mitchell,* [No. 08 JE 5, 2008 WL 5412414 (Ohio Ct.
> App. 7 Dist. Dec. 16, 2008) (unpublished)]; *State v. Elliot,* [No. 86461, 2006 WL
> 562152 (Ohio Ct. App. 8 Dist. Mar. 9, 2006) (unpublished)]. Those rulings, Garr
> argues, accord with due process and sound public policy.
>
> The state, by contrast, contends that *Chandler* is limited to those cases involving the
> recovery of a counterfeit drug. It notes that Ohio's drug-trafficking laws subject both
> offers to sell and actual sales to the same legal penalties and that these laws define
> baseline offenses and sentencing enhancements in terms of the quantity involved in
> a trafficking violation. Thus, the state contends that *Chandler* corrected a factual
> error-that the substance offered was 130.87 grams of baking soda instead of 100
> grams of crack cocaine-but did not prohibit the use of all quantity-based provisions
> whenever no drug is recovered and testable. Because any admissible evidence,
> including circumstantial evidence, can be used to establish the identity and quantity
> of the drug Garr offered to sell, the state argues that the circumstantial evidence cited
> by the appellate court demonstrates that Garr offered to sell cocaine, and that the

absence of any contradictory evidence-such as the presence of a counterfeit substance, as in *Chandler*-leaves the evidence unchallenged and sufficient to prove both the identity and quantity of the cocaine beyond a reasonable doubt.

We focus then on the issue of whether our holding in *Chandler* extends to an offer-to-sell drug-trafficking case where no drugs are recovered or tested.

**** 

The issue as we recited in *Chandler* concerned "whether a person can be subject to the special penalty statute applicable to a major drug offender for a first-degree felony drug conviction when the substance offered as crack cocaine contains no detectable amount of the drug."... In that case, at separate trials, juries convicted defendants ... of trafficking in crack cocaine. Despite the fact that the laboratory testing revealed that the substance they had offered to sell was baking soda, both juries further found that the amount of the drug involved equaled or exceeded 100 grams of crack cocaine, which triggered the enhanced MDO penalty.... [W]e stated: "Undoubtedly, a person can be convicted for offering to sell a controlled substance in violation of R.C. 2925.03(A)(1) without actually transferring a controlled substance to the buyer."... However, we affirmed the appellate court judgment reversing the mandatory sentences imposed, noting that the General Assembly authorized criminal penalties for drug trafficking based on identity and amount of the controlled substance involved, R.C. 2925.03(C), and that "[b]y the terms of the penalty statute for cocaine, R.C. 2925.03(C)(4), the substance involved in the violation is to *be* cocaine or, at the very least, 'a compound, mixture, preparation, or substance *containing* cocaine.'"... Thus, because testing revealed that the substance involved was baking soda, not cocaine, the jury's finding that the amount of the drug equaled or exceeded 100 grams of crack cocaine was contrary to fact.... Consequently, we held that "[a] substance offered for sale must contain some detectable amount of the relevant controlled substance before a person can be sentenced as a major drug offender under R.C. 2925.03(C)(4)(g)."...

### Analysis

*Chandler* did not address the principle that the state can establish any element of any crime through circumstantial evidence....

Our decision in *Chandler* that a substance offered for sale must contain "some detectable amount" of the relevant controlled substance before a person can be sentenced as a major drug offender is limited to those cases where the substance offered for sale is recovered and subjected to testing to determine whether it contains a detectable amount of the drug offered for sale. It does not apply to situations where no drug is recovered and no testing is performed. Hence, where an offender offers to sell a controlled substance in a quantity that would implicate the MDO

6

specification, and where no substance is ever recovered or tested, *Chandler* is factually distinguishable, as it is a counterfeit drug case where the alleged drug was recovered and tested. Therefore, *Chandler* does not apply to the situation as presented here where Garr offered to sell a drug that was not recovered. In such a case, the offender may be convicted of a[] MDO specification in a properly proven case.

*Id.* at 1065-67.

## Reinstatement and Present Posture Of Case

Respondent filed a notice of the Ohio Supreme Court's decision with this Court, and the case was reinstated on the Court's active docket by Order entered June 16, 2010. (Doc. 33). In the Order reopening the case, the Court also granted petitioner's *pro se* motions, filed before the case was stayed, requesting the appointment of counsel from the Ohio Public Defender's Office to represent him in this matter. (Doc. 33, pp. 2-4). Petitioner was ordered to file a supplemental memorandum responding to the Ohio Supreme Court's June 8, 2010 decision on the certified state-law question and in support of his claims for federal habeas relief; respondent also was provided an opportunity to respond to petitioner's supplemental pleading. (Doc. 33, p. 4).

Petitioner's counsel filed a supplemental memorandum on petitioner's behalf as ordered on July 16, 2010. (Doc. 34). In the memorandum, petitioner recognized that the Ohio Supreme Court determined that *Chandler*'s holding is limited to counterfeit drug cases where the substance offered for sale was recovered and tested and, therefore, does not extend to the case-at-hand where no drugs were recovered or tested to ascertain whether they contained a detectable amount of the controlled substance. (Doc. 34, pp. 3, 6). Although petitioner initially relied on *Chandler* in framing his claims challenging the sufficiency of evidence, he now contends that the circumstantial evidence introduced at his trial was insufficient to establish his guilt beyond a reasonable doubt as a major drug offender

7

on the trafficking charge. (Doc. 34, pp. 5-12). Upon close review of the memorandum, it appears that petitioner is claiming that his "cursory statements" and "scant assertions ... regarding the quality and quantity of the cocaine offered for sale," which were made in recorded conversations with a police informant, "might have called for reasonable speculation that [he] offered to sell cocaine in an amount equal to or exceeding one kilogram," but not "a permissible inference of that essential fact." (Doc. 34, pp. 5, 9-11).

Respondent filed a brief responding to petitioner's new arguments and requesting that the record be expanded to include "the record of the trial and four exhibits of taped conversations between [petitioner] and [Robert] Carr," the police informant. (Doc. 35). Petitioner replied to respondent's motion to expand the record, arguing that the trial transcript previously filed in the case already had been considered by this Court prior to its certification of the state-law question. (Doc. 36, p. 3). However, petitioner also stated that he had "no objection to the undertaking of a full review" of the complete trial record and requested that he be provided "the opportunity to file a response to the Warden's substantive arguments" should the Court decide "that additional consideration of the trial court transcript and exhibits is necessary." (Doc. 36, pp. 3-4).

On September 29, 2010, the Court issued an Order granting respondent's request to expand the record "to include not only the trial transcript previously filed in this case ..., but also the transcripts of recorded conversations between petitioner and Carr that were introduced at trial." (Doc. 37, p. 2). In so ruling, the Court stated:

> The Court's prior consideration of petitioner's sufficiency of evidence claim focused solely on the issue raised by petitioner on direct appeal as to whether *Chandler* extended to the instant case and required that the cocaine offered for sale by petitioner actually be recovered and tested before his guilt as a major drug offender could be established.... Because the Ohio Supreme Court has determined that

8

> *Chandler* is distinguishable and petitioner now challenges the sufficiency of the
> circumstantial evidence that was introduced at trial regarding the amount of cocaine
> offered for sale, the Court agrees with respondent that the record should be expanded
> as requested to ensure that the constitutional claim is properly considered herein.

(Doc. 37, pp. 2-3). Petitioner was allowed to file an additional pleading responding to the

substantive arguments asserted by respondent, which were based on the record as expanded. (Doc.

37, p. 3). Petitioner's counsel filed the responsive pleading on petitioner's behalf on October 28,

2010. (Doc. 39).

## II. STANDARD OF REVIEW

In this federal habeas case, the applicable standard of review for evaluating the state courts'

factual findings is set forth in 28 U.S.C. § 2254(e)(1), and the applicable standard of review for

evaluating the underlying merits of petitioner's federal claims for relief is set forth in 28 U.S.C. §

2254(d).

Under 28 U.S.C. § 2254(e)(1), the state courts' factual findings are presumed to be correct

unless the petitioner rebuts the presumption by "clear and convincing evidence." *See McAdoo v. Elo,*

365 F.3d 487, 493-94 (6th Cir.), *cert. denied,* 543 U.S. 892 (2004). Moreover, under § 2254(d), a

writ of habeas corpus may not issue with respect to any claim adjudicated on the merits by the state

courts unless the adjudication either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established federal law, as determined by the United States
> Supreme Court; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the
> facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

A legal principle is "clearly established" for purposes of habeas corpus review "only when

it is embodied in a holding of [the Supreme] Court." *Thaler v. Haynes,* 130 S.Ct. 1171, 1173 (2010).

"[A] federal habeas court reviewing the state-court judgment must apply the law that controlled 'at

the time his state-court conviction became final.'" *Miller v. Stovall,* 608 F.3d 913, 919 (6th Cir.

2010) (quoting *Williams v. Taylor,* 529 U.S. 362, 390 (2000)).

In addition, the "contrary to" and "unreasonable application" clauses set forth in 28 U.S.C.

§ 2254(d)(1) have independent meanings:

> A federal habeas court may issue the writ under the "contrary to" clause if the state
> court applies a rule different from the governing law set forth in [Supreme Court]
> cases, or if it decides a case differently than [the Supreme Court has] done on a set
> of materially indistinguishable facts...  The court may grant relief under the
> "unreasonable application" clause if the state court correctly identifies the governing
> legal principle from [the Supreme Court's] decisions but unreasonably applies it to
> the facts of a particular case.... The focus on the latter inquiry is on whether the state
> court's application of clearly established federal law is objectively unreasonable, and
> ... an unreasonable application is different from an incorrect one.

*Bell v. Cone,* 535 U.S. 685, 694 (2002) (citation omitted).  Under § 2254(d)(1)'s "unreasonable

application" clause, the writ may issue only if the application is objectively unreasonable "in light

of the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the

relevant state court decision." *McGhee v. Yukins,* 229 F.3d 506, 510 (6th Cir. 2000) (citing *Williams,*

529 U.S. at 412).

## III. PETITIONER'S CLAIMS FOR HABEAS RELIEF LACK MERIT

In the two grounds for relief alleged in the petition, petitioner essentially contends the

evidence introduced against him at trial was insufficient to establish beyond a reasonable doubt that

he offered to sell cocaine in an amount equal to or exceeding 1000 grams and thus was guilty of a

first-degree felony and MDO offense requiring the imposition of a mandatory ten-year sentence

under the enhanced penalty provision set forth in Ohio Rev. Code § 2925.03(C)(4)(g).  (Doc. 1, pp.

10

6, 8; *see also* Docs. 34, 39). In so arguing, petitioner concedes that the evidence was sufficient to support a conviction and sentence for trafficking in cocaine as a fifth-degree felony under Ohio Rev. §§ 2925.03(A)(1) and 2925.03(C)(4)(a).

The Supreme Court precedent setting forth the clearly-established federal legal principles applicable to the case-at-hand is *Jackson v. Virginia,* 443 U.S. 307 (1979). The Due Process Clause requires the State to prove beyond a reasonable doubt every fact necessary to constitute the charged offense. *In Re Winship,* 397 U.S. 358, 363-64 (1970). When a petitioner raises a sufficiency-of-evidence claim in a petition for a writ of habeas corpus, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 319 (emphasis in original).

In assessing whether the evidence of guilt satisfies due process under the *Jackson* standard, the State is not required to rule out every hypothesis except that of guilt beyond a reasonable doubt. *Id.* at 326. Rather, "a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.*; *see also Walker v. Engle,* 703 F.2d 959, 969-70 (6th Cir.), *cert. denied,* 464 U.S. 951, 962 (1983). Consequently, the reviewing court is not permitted to make its own subjective determination of guilt or innocence or otherwise substitute its opinion for that of the trier of fact which convicted the petitioner. *Jackson,* 443 U.S. at 318-19 & n.13; *see also York v. Tate,* 858 F.2d 322, 329 (6th Cir. 1988) (*per curiam*), *cert. denied,* 490 U.S. 1049 (1989).

Moreover, the *Jackson* standard "must be applied with explicit reference to the substantive

11

elements of the criminal offense *as defined by state law.*" *Jackson,* 443 U.S. at 324 n.16 (emphasis

added); *see also Sanford v. Yukins,* 288 F.3d 855, 860 (6th Cir.), *cert. denied,* 537 U.S. 980 (2002).

"Circumstantial evidence alone is sufficient to support a conviction." *Newman v. Metrish,* 543 F.3d

793, 796 (6th Cir. 2008) (quoting *Johnson v. Coyle,* 200 F.3d 987, 992 (6th Cir. 2000)), *cert. denied,*

130 S.Ct. 1134 (2010). Due process is satisfied as long as such evidence is enough for a rational

trier of fact to make a permissible *inference* of guilt, as opposed to a reasonable *speculation* that the

petitioner is guilty of the charged crime. *Id.* at 796-97 (and Sixth Circuit cases cited therein).

In this case, the Ohio Court of Appeals was the only state court to issue a reasoned decision

addressing the merits of petitioner's due process claim. (Doc. 6, Ex. 8). The court first provided the

following factual summary of the evidence:

> The facts of this case are largely undisputed. During a sting operation, Garr told
> police informant Robert Carr that he would sell him two kilograms of cocaine for
> $42,000. At trial, the state played a series of recorded conversations between Garr
> and Carr detailing the terms of the transaction, which included two discussions about
> the quality of the cocaine. Carr and Garr eventually met in a restaurant parking lot
> with the understanding that Garr was to deliver the cocaine to Carr, and that Carr
> would pay him for it later. But due to a disagreement over payment, the sale was not
> completed, and Garr never produced any cocaine. Police monitoring the scene
> allowed Garr to leave without incident. Garr was not arrested until several months
> later, and the state never recovered any substance offered for sale in connection with
> these events.

(Doc. 6, Ex. 8, p. 2).

The court went on to discuss *Chandler*, which no longer is even arguably applicable to the

case-at-hand, and held that the State could establish "the amount of the controlled substance" based

on circumstantial evidence. (Doc. 6, Ex. 8, pp. 3-4). The court reasoned: "It is beyond question that

the state may attempt to establish any element of any crime through circumstantial evidence. We

find no reason to make an exception for the elements of R.C. 2925.03(C)(4)(g)." (Doc. 6, Ex. 8, p.

4). Turning next to an examination of the record, the court ruled in relevant part as follows:

> [T]here is sufficient circumstantial evidence in the record to support [G]arr's conviction and sentence. At trial, the state played recorded conversations between Garr and Carr during which Garr offered to sell cocaine to Carr. The amount of cocaine that Garr had offered to sell was identified multiple times and was never less than two kilograms. During one conversation, Carr indicated that he would not pay for the cocaine if it was counterfeit. During another conversation, Garr represented to Carr that the cocaine he intended to sell him was of high quality.

> Viewing this evidence in the light most favorable to the state, we hold that a rational trier of fact could have concluded beyond a reasonable doubt that Garr had offered to sell Carr 1000 or more grams of actual cocaine. We therefore hold that Garr's MDO-specification conviction was supported by sufficient evidence, and that the trial court properly sentenced Garr under R.C. 2925.03(C)(4)(g) as a first-degree felon and as a major drug offender.

(Doc. 6, Ex. 8, pp. 4-5) (footnotes omitted).

Although the Ohio Court of Appeals did not cite Supreme Court precedents in addressing petitioner's sufficiency-of-evidence claims, the court utilized the proper standard of review established by the Supreme Court in *Jackson* in assessing whether, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found beyond a reasonable doubt the essential elements of a first-degree-felony cocaine-trafficking offense and MDO classification under Ohio Rev. Code §§ 2925.03(A)(1) and 2925.03(C)(4)(g). (*See* Doc. 6, Ex. 8, p. 4). The Ohio Court of Appeals also properly recognized that "[c]ircumstantial evidence alone is sufficient to support a conviction." *Newman,* 543 F.3d at 796 (quoting *Johnson,* 200 F.3d at 992). (*See also* Doc. 6, Ex. 8, p. 4). Upon review of the trial record, including the transcripts of the recorded conversations between petitioner and the informant that were admitted at trial, the undersigned concludes that the state appellate court's adjudication of the due process issue also involved a reasonable application of the *Jackson* standard and was based on a reasonable determination of the facts in light of the record evidence.

13

It is well-settled in Ohio that a person may be convicted of a trafficking offense under Ohio Rev. Code § 2925.03(A)(1) based on evidence establishing that he knowingly offered to sell a controlled substance, even in cases where (1) the drug offered actually was counterfeit; or (2) the sale was not consummated and the substance was never recovered. *See Chandler,* 846 N.E.2d at 1236-37; *Patterson,* 432 N.E.2d at 803. Under the penalty provision set forth in Ohio Rev. Code § 2925.03(C)(4), if the drug involved in the trafficking offense "is cocaine or a compound, mixture, preparation, or substance containing cocaine," the person who violates § 2925.03(A)(1) is guilty of trafficking in cocaine. The statute further provides in pertinent part that the offense of trafficking in cocaine is a felony of the fifth degree except: "If the amount of the drug involved equals or exceeds one thousand grams of cocaine ..., trafficking in cocaine is a felony of the first degree, the offender is a major drug offender, and the court shall impose as a mandatory prison term the maximum prison term prescribed for a felony of the first degree and may impose an additional mandatory prison term prescribed for a major drug offender." Ohio Rev. Code § 2925.03(C)(4)(a), (g).

Here, petitioner does not dispute that a rational juror could have found him guilty beyond a reasonable doubt under Ohio Rev. Code § 2925.03(A)(1) of offering to sell cocaine as a fifth-degree-felony offense under Ohio Rev. Code § 2925.03(C)(4)(a). He contends, however, that a rational juror could not have inferred from petitioner's "cursory statements" to the informant that the substance actually was cocaine in an amount equal to or exceeding 1000 grams for purposes of establishing his guilt under the MDO penalty provision set forth in Ohio Rev. Code § 2925.03(C)(4)(g). In so arguing, petitioner relies on "serious concerns" expressed by the magistrate judge in the March 2, 2009 Report and Recommendation to the effect that an "extremely close

14

question is presented here as to whether [the circumstantial evidence presented at trial] is enough to support a permissible *inference*, as opposed to reasonable *speculation*, that petitioner actually had the cocaine with him to sell to the informant if an agreement could have been reached regarding payment at their final meeting." (Doc. 14, p. 22). The magistrate judge noted that although petitioner made statements to the informant about the quality and amount of cocaine to be sold and the investigator conducting surveillance of the parties' final meeting testified about his "belief" that the cocaine was in another car parked nearby, no cocaine was ever observed or recovered to ascertain whether the substance in fact existed as described by petitioner. (Doc. 14, p. 22 n.10).

However, at that time, the Court's consideration of the sufficiency of evidence was "focused solely on the issue raised by petitioner on direct appeal as to whether *Chandler* extended to the instant case and required that the cocaine offered for sale actually be recovered and tested before his guilt as a major drug offender could be established." (Doc. 37, pp. 2-3; *see also* Docs. 14, 28). The magistrate judge expressed "serious concerns" only to the extent that "the Ohio courts agreed *Chandler* applies as requiring proof beyond a reasonable doubt of a detectable amount of cocaine before petitioner could be subjected to the enhanced penalty provision set forth in Ohio Rev. Code § 2925.03(C)(4)(g), and petitioner claims that there is no basis on which the trier of fact could have found that fact beyond a reasonable doubt." (Doc. 14, pp. 21-22).

The magistrate judge went on to point out that the Ohio Court of Appeals had also sought to distinguish *Chandler* in light of evidence presented in that case affirmatively demonstrating that the jury was mistaken in finding that the substance offered for sale was cocaine. (Doc. 14, p. 22). Although the Ohio appellate court had not gone so far as to conclude that *Chandler*'s holding is limited to cases involving a counterfeit substance, the magistrate judge emphasized that if the state-

15

law question certified to the Ohio Supreme Court regarding the applicability of *Chandler* to the case-at-hand "is decided in the State's favor, the Court would *not* have to decide the extremely close, fact-based sufficiency-of-evidence claim" that had been raised by petitioner based on *Chandler*. (Doc. 14, p. 22) (emphasis added).

Under Ohio law, as subsequently clarified by the Ohio Supreme Court in answering the certified state-law question in the State's favor in the instant case, petitioner could be found guilty of the first-degree-felony, MDO trafficking offense under the enhanced penalty provision set forth in Ohio Rev. Code § 2925.03(C)(4)(g) based solely on circumstantial evidence, or in other words, in the absence of direct evidence that the substance offered for sale in fact existed as described in the offer. *See Garr,* 933 N.E.2d at 1067. In ruling on the certified question, the Ohio Supreme Court specifically held that a person may be convicted of an MDO specification in cases where the drug offered for sale is not recovered. *Id.* Although the court did not elaborate further about what a "properly proven case" based solely on circumstantial evidence entails, the state supreme court clearly held in answering the certified question "in the negative" that *Chandler*'s holding, requiring that the substance contain a "detectable amount of cocaine," only applies in cases where the substance was recovered, subjected to testing and found to be counterfeit. *See id.*[2]

Neither party has cited any cases supporting their positions regarding the circumstantial evidence necessary to support a reasonable inference under the MDO penalty provision, Ohio Rev.

---

[2]Recently, an Ohio appellate court reversed an enhanced penalty for a trafficking offense because although the defendant offered to sell an amount within the range specified in the penalty provision, "all evidence" indicated that the amount *actually* sold fell below the minimum required to trigger that penalty. *See State v. Siggers,* No. 09CA0028-M, 2010 WL 1227705, at *4 (Ohio Ct. App. 9 Dist. Mar. 31, 2010) (unpublished). In that case, as in *Chandler,* the completed transaction did not conform with the offer to sell or the jury's finding regarding the identity and quantity of the substance involved in the offense. For the same reason that *Chandler* does not extend to the case-at-hand, *Siggers* also is distinguishable from the instant case where no drugs were recovered.

Code § 2925.03(C)(4)(g), that the substance involved in the trafficking offense equaled or exceeded 1000 grams of cocaine. In assessing the sufficiency of evidence supporting a trafficking conviction prior to the enactment of the MDO penalty provision, the Ohio Supreme Court stated:

> Triers of fact should consider the totality of circumstances and decide whether, in a particular scenario, there is sufficient evidence to prove beyond a reasonable doubt that the accused has knowingly offered to sell a controlled substance. For example, the dialogue and course of conduct of the accused, as well as the nature of the goods transferred, may be relevant to this determination. Individually, no aspect of any of these examples is the ultimate fact. Collectively, they may or may not prove that the accused knowingly offered to sell a controlled substance.

*Patterson,* 432 N.E.2d at 803.

In this case, because the sales transaction was not consummated and no drugs were recovered, "the nature of the goods transferred" is not part of the "totality of circumstances" that may be evaluated in determining the sufficiency of the circumstantial evidence. The penalty provision enacted after *Patterson* was decided did not add an additional requirement that the sales transaction must be actually attempted or completed, or that drugs must be found on the offender or in his possession, in order to establish beyond a reasonable doubt a first-degree-felony MDO offense. Indeed, the Ohio Supreme Court has made it clear in answering the certified question posed in this case that an accused can be found guilty of a MDO trafficking offense in an offer-to-sell case where no sale took place and no drugs were recovered. *See Garr,* 933 N.E.2d at 1067; *cf. State v. Pryor,* No. 93970, 2010 WL 5236231, at *3 (Ohio Ct. App. 8 Dist. Dec. 16, 2010) (unpublished) (in emphasizing that "Ohio courts have consistently held that finding drugs on the offender is irrelevant to a conviction for drug trafficking," the court pointed out that in *Garr,* 933 N.E.2d at 1067, ¶¶28-29, the Ohio Supreme Court ruled that its "holding in *Chandler* ... that actual drugs must be found in order to sentence someone as a major drug offender, 'does not apply to offer-to-sell trafficking cases

17

where no drugs are recovered or tested'").

The Ohio appellate court cases cited by petitioner as support for his position in the proceeding before the Ohio Supreme Court on the certified state-law question no longer provide guidance in addressing whether the circumstantial evidence was enough to establish petitioner's guilt as a major drug offender. In both of those cases, the courts relied on *Chandler's* holding that a specific amount of the drug must be shown to actually exist before the penalty enhancement may be imposed. *See, e.g., State v. Mitchell,* No. 08 JE 5, 2008 WL 5412414 (Ohio Ct. App. 7 Dist. Dec. 16, 2008) (unpublished); *State v. Elliot,* No. 86461, 2006 WL 562152 (Ohio Ct. App. 8 Dist. Mar. 9, 2006) (unpublished).

The case-law in Ohio arguably relevant to the issue posed by the instant case is admittedly sparse. However, the Eighth District Court of Appeals has issued a couple of decisions in analogous cases, which do provide some guidance in determining when an enhanced penalty is warranted based on circumstantial evidence. In *State v. Pimental,* No. 84034, 2005 WL 273009, at *1 (Ohio Ct. App. 8 Dist. Feb. 3, 2005) (unpublished), *appeal dismissed,* 828 N.E.2d 118 (Ohio 2005), *and appeal dismissed,* 841 N.E.2d 321 (Ohio 2006), the defendant was convicted of trafficking drugs with a MDO specification. He alleged on appeal that the trial court erred in finding him guilty of an "anticipatory" trafficking offense, which the appellate court construed as a claim challenging the sufficiency of evidence. *Id.* at *3. In rejecting the assignment of error and finding the evidence was sufficient to support the trafficking conviction, the court reasoned in relevant part:

> In the instant case, Pimental did not sell any controlled substance. However, there is sufficient evidence to prove that he did offer to sell a controlled substance. [The informant] testified and the recorded conversations confirm that Pimental was ready and willing to provide drugs to [the informant].
>
> During the conversations, the parties established the amount of drugs that Pimental

18

would supply to [the informant] for selling as "two or three." [The informant] testified that the phrase meant two or three kilos of cocaine. The parties also established the time and place for delivery.... The totality of the recorded conversations demonstrated that Pimental and [the informant] were arranging to "do what we used to do." [The informant] testified that it meant that Pimental "would bring drugs in and our plan to meet and where to pick them up ***."

Although no drugs were in Pimental's possession at the time of his arrest, possession of a controlled substance is not a necessary element of drug trafficking.

*Id.* at *4.

In another case, *State v. Short,* No. 83804, 2005 WL 2100969, at *2-3 (Ohio Ct. App. 8 Dist. Sept. 1, 2005) (unpublished), *aff'd on other grounds,* 847 N.E.2d 1174 (Ohio 2006), the defendant challenged the sufficiency of evidence supporting his first-degree-felony, MDO trafficking conviction. In that case, as in the instant case, the defendant offered to sell an amount of crack cocaine that qualified as a first-degree-felony, MDO offense under Ohio Rev. Code § 2925.03(C)(4)(g). Although the sale was not consummated and no drugs were recovered, the court found that the following circumstantial evidence was sufficient to establish the defendant's guilt as a first-degree felon and major drug offender: the defendant's use of a coded paging system to distribute crack cocaine; his recorded statement that "getting five ounces would not be a problem;" and his recorded statements about how much he would charge per ounce." *Id.* at *4. The court held that although "many of these conversation and rituals involved coded language and drug terminology," a rational trier of fact could still infer from the evidence the essential elements required to establish the defendant's guilt under the MDO penalty provision. *Id.*

Thereafter, the defendant in *Short* filed a federal habeas petition with the United States District Court for the Northern District of Ohio. The magistrate judge recommended that the petition be denied, but agreed with the petitioner's allegation that "the level of drugs in [his] possession did not

rise to the level of drugs required to characterize him as a major drug offender." *See Short v. Bradshaw,* No. 1:07cv2989, 2008 WL 5000026, at *2 (N.D. Ohio Nov. 25, 2008) (unpublished). In adopting the magistrate judge's Report and Recommendation to deny habeas relief, the district judge held that the magistrate judge erred in concluding that petitioner should not have been classified as a major drug offender. *See id.* at *2-3. In so ruling, the court reasoned:

> Petitioner need not have possessed 100 grams or more of crack cocaine in order to qualify for the major drug offender specification where he was caught on tape saying he could obtain five ounces of crack cocaine. That Petitioner was involved in a potential transaction of five ounces of crack cocaine is sufficient for a rational trier of fact to find Petitioner guilty of first-degree drug trafficking with the major drug offender specification.

*Id.* at *3.

In federal drug trafficking cases, the sentencing guidelines provide that in cases involving an agreement to sell a controlled substance that is not completed, the courts must use the agreed-upon quantity to determine the offense level unless it is shown that "the defendant did not intend to provide or was not reasonably capable of providing the agreed-upon quantity." *United States v. Vasquez,* 352 F.3d 1067, 1071 (6th Cir. 2003), *cert. denied,* 541 U.S. 1004 (2004). Although the standards set forth in the federal sentencing guidelines differ from Ohio's enhanced penalty provisions for drug trafficking offenses, the factors considered by the federal courts in determining whether the agreed-upon quantity should control also are relevant for purposes of assessing whether a drug trafficker qualifies as a major drug offender under Ohio law. Specifically, in *Vasquez,* the Sixth Circuit stated that "the fact that the supplier was engaging in transactions involving similar quantities of the drug at issue during the same time period can be probative evidence that the defendant was reasonably capable of providing that amount." *Id.* at 1073. The court also cited other relevant factors that are "indicative of the defendant's intent and capability," which include "whether the defendant engaged in serious negotiations rather

20

than mere 'idle talk,' whether the defendant participated in similar transactions on prior occasions, and whether the defendant hesitated before agreeing to the transaction." *Id.*

Here, upon review of the "totality of circumstances" based on the evidence presented at trial, the Court concludes that a rational juror could infer from petitioner's statements about the quality and amount of the cocaine offered for sale, which were made during two recorded meetings and several recorded phone conversations with the informant, as well as from the circumstances leading up to and surrounding the failed transaction, that the substance offered for sale was cocaine in an amount equal to or exceeding 1000 grams.

Specifically, Robert Carr testified that he met petitioner in 2004 in Dayton, when Carr's cousin stole three kilograms of cocaine from "Ronnie B," whom Carr described as petitioner's "right-hand man." (Doc. 35, Trial Tr. 607-08). Carr was "called to the scene" by his cousin, who was being threatened. (Doc. 35, Trial Tr. 608-09). When Carr arrived there, he found his cousin in a car with Ronnie B. and petitioner, whom Carr only knew as "Lucky." (Doc. 35, Trial Tr. 608-09, 704). Petitioner told Carr that "somebody had to pay for it because he got to answer to somebody." (Doc. 35, Trial Tr. 609). Carr testified that he "managed to calm the situation down" by proposing "to do more business" to pay petitioner back for the loss of the three kilos. (Doc. 35, Trial Tr. 610). Carr later contacted the police and met with Cincinnati Regional Narcotics Unit (RENU) agent Kyle Ingram, informing Ingram that he "had some information" about "Lucky," which Carr hoped would be helpful in obtaining the release of another relative incarcerated in Cincinnati. (Doc. 35, Trial Tr. 611-612).

Ingram testified that Carr did contact him about a cousin's involvement in a robbery of three kilograms of cocaine. (Doc. 35, Trial Tr. 711). Carr told Ingram that he "believed that the best way to handle his cousin's problem was [to involve the police] instead of work[ing] it out by paying the

21

guy back or whatever." (Doc. 35, Trial Tr. 711). Ingram agreed to use Carr as an informant. (Doc. 35, Trial Tr. 711). Ingram confirmed that Carr had a series of telephone conversations with petitioner and met with petitioner on two occasions; the two meetings were video and audio taped. (Doc. 35, Trial Tr. 712).

Both Ingram and Carr testified that the phone conversations reflected Carr's and petitioner's "general understanding" that they were "going to get together and work out some arrangements [for] making or doing business together" in order to "make good on the robbery." (Doc. 35, Trial Tr. 617, 712). In a recorded phone conversation on January 19, 2005, numerous slang references were made to the three kilos that had been stolen, which cost at a "bare minimum" $20,000 per kilo. (Doc. 35, Ex. 28; Trial Tr. 621-26).

The first meeting between petitioner and Carr took place at Dave & Buster's in Sharonville on January 20, 2005. (Doc. 35, Ex. 29; Trial Tr. 629). Carr testified that at that meeting, "we basically talked about prices, how we would do things ... to solve the matter." (Doc. 35, Trial Tr. 630). During that meeting, Carr indicated that neither he nor his cousin had the cash to purchase the kilos up-front and asked petitioner if he would "do a favor" by giving them two kilograms of cocaine, which would be paid for on the back-end after they sold the cocaine at a profit; Carr vouched for his cousin as a "co c," or co-signer, "on everything" and personally guaranteed that the debt owed to petitioner eventually would be repaid through additional profits of $6,000-$7,000 a "couple of kilos at a time." (Doc. 35, Trial Tr. 634-35, 655; Ex. 29, lines 41, 100-140). According to Carr, his cousin "would have to get [20] kilos from Garr to make enough money to pay back the 63[,000 dollars] that he owe[d]." (Doc. 35, Trial Tr. 635).

The conversation continued with petitioner indicating at one point that he had been dealing

22

with suppliers in Mexico for five years. (Doc. 35, Ex. 29, lines 197-208). At another point, petitioner said: "We gonna try and right the situation." (Doc. 35, Ex.29, line 451). At the close of the meeting, petitioner and Carr exchanged phone numbers, and petitioner stated: "I'll probably get something this weekend set aside just for that purpose." (Doc. 35, Ex. 29, lines 464-476).

Immediately after petitioner left Dave & Buster's, Carr spoke with Ingram through the audio monitor.  Carr asked Ingram for money because "[i]t's gonna be bigger tha[n] what" he initially had thought. (Doc. 35, Ex. 29, lines 498-500).  Apparently, much of the conversation between Carr and petitioner could not be overheard because petitioner was whispering. (Doc. 35, Ex. 29, lines 501-502). Carr said that petitioner told him that he "ride[s] around with a million dollars." (Doc. 35, Ex. 29, line 506).  Carr also stated that petitioner talked about "getting ... [t]wenty five to fifty," and that the "dope [was] coming from Los Angeles." (Doc. 35, Ex. 29, lines 506-512, 530).  The colloquy between Carr and Ingram continued in pertinent part:

> Agent Ingram:  Did it seem like he was hesitant at all about what you were purposing (sic)?
>
> [Carr]:  Once I got around to like throwing me a couple, he said no problem.  He like, you know ... he['s] just skeptical cause of you know what happened.
>
> ***
>
> Agent Ingram:  Now the question I guess would be how much do you trust him to ... not put a couple packs together that ain't no good.
>
> [Carr]:  He ain't gonna do that....  You know why he wouldn't do it cause I was speaking on him like you know the Mexicans would try to put some shit on you to[o] now.  I been dealing with them for five years.  I ain't never had a problem....  You getting that dope from L.A.  I know where that dope coming from.  But, even if he is getting it from the Mexicans he saying he been dealing with this little Mexican for five years....
>
> ***

23

Agent Ingram: Did it sound like he was gonna have some in this weekend?

[Carr]: Yeah.... He said he had seven left when he gave them three up. That's why I'm like ... all you getting is seven, that ain't shit. I'm like shit, I normally get twenty five. That's when he hit me with, yeah I get twenty five to fifty at a time myself....

(Doc. 35, Ex. 29, lines 549-562).

The second meeting was held in the parking lot of a Bob Evans restaurant on February 2, 2005, the day the transfer of drugs to Carr was planned to take place. (Doc. 35, Ex. 30; Trial Tr. 613-14). On February 1, 2005, petitioner had told Carr in a recorded phone conversation that "we got the soft and all down here." (Doc. 35, Ex. 30, Call One, line 7). Carr testified at trial that the term "soft" refers to cocaine and that "hard" means crack cocaine. (Doc. 35, Trial Tr. 656-657). In a recorded phone conversation en route to Bob Evans, Carr told petitioner that he had a driver; that the kilos were to be placed "in my man's trunk;" and that "my man gonna take off." (Doc. 35, Ex. 30, Call Three, lines 14-24; Trial Tr. 657).

In another recorded phone conversation that took place just as petitioner was "getting ready to leave" to meet Carr at Bob Evans, petitioner asked Carr, "How many kids did you want?" (Doc. 35, Ex. 30, Call Four, lines 3, 5). Carr testified at trial that petitioner was referring to "kilos" when talking about "kids." (Doc. 35, Trial Tr. 658). Carr told petitioner that he had "asked for two kids," but wanted to know their price by using code terminology referring to the size of the kids' pants. (Doc. 35, Ex. 30, Call Four, lines 6-10; Trial Tr. 658). In reply, petitioner indicated that a kilo could cost as much as $22,000, but that "they be havin' them dollar off coupons," which meant that Carr could purchase a kilo for $21,000. (Doc. 35, Ex. 30, Call Four, lines 11-15; Trial Tr. 658-659).

Carr then changed his order to three kilos. He stated: "Bring me three kids and ... I think two of them ... I'll probably bring back to you tomorrow if they acting right. Long as they got good

24

behavior." (Doc. 35, Ex. 30, Call Four, lines 18-22). Carr testified that what he meant by that statement was that as long as the three kilos were of good quality, he would bring petitioner "money back for two of the kilos and ... would still have one kilo" remaining in his possession to sell at a later time. (Doc. 35, Trial Tr. 659-660). In response, petitioner vouched for the quality of the cocaine, stating "they definitely got [good behavior]." (Doc. 35, Ex. 30, Call Four, line 23). When Carr next asked petitioner "is we good?," petitioner responded: "Without a doubt. No questions at ... all;" Carr understood petitioner's response to mean that petitioner had "plenty of kilos" to sell. (Doc. 35, Ex. 30, Call Four, lines 24-25; Trial Tr. 660).

As the conversation continued, petitioner and Carr eventually reached an agreement that petitioner would supply Carr with two kilograms of cocaine, which Carr would take to Dayton to sell, and that Carr would bring $42,000 "right back" to petitioner after the kilos were sold. (Doc. 35, Trial Tr. 663; Ex. 30, Call Four, lines 40-43). Carr testified that at that point he expected petitioner to front him two kilograms of cocaine at "$21,000 a piece," which he would pay for later after they were resold. (Doc. 35, Trial Tr. 662).

Carr was the first to arrive at Bob Evans, where Ingram and two other RENU agents were also present to conduct surveillance. (Doc. 35, Trial Tr. 669). Petitioner arrived twenty minutes later in a black automobile driven by another man, whom Carr recognized as the "[s]ame guy that has always been with" petitioner, including at the prior meeting held at Dave & Buster's. (Doc. 35, Trial Tr. 670-71). Right before petitioner drove into the parking lot, Carr observed to Ingram through the audio monitor that he noticed petitioner was "at a blue ford Taurus sittin' over here in Sunoco." (Doc. 35, Ex. 31, line 12). When petitioner next pulled beside Carr, Carr exited his vehicle and entered petitioner's car to converse with the men. (Doc. 35, Trial Tr. 671). Carr did not see any drugs in

25

petitioner's car. (Doc. 35, Trial Tr. 682-83; Ex. 31, line 221). Carr testified that he believed the other

vehicle that he had noticed, which was parked at the nearby gas station, was operated by petitioner's

"driver" and contained the kilos of cocaine to be delivered that day. (Doc. 35, Trial Tr. 679). Ingram

also testified that he believed the cocaine was in the other car observed parked at the gas station. (Doc.

35, Trial Tr. 724). Carr mentioned to Ingram at the close of the audio recording of the Bob Evans'

meeting that "they had somebody follow them, yea they brought somebody [who] followed them."

(Doc. 35, Ex. 31, line 221).

The negotiated transaction between petitioner and Carr never happened. It appears from the

record that a disagreement arose at the Bob Evans meeting because petitioner did not want to front the

cocaine and then have to wait to be paid while Carr drove alone to and from Dayton, where the drugs

were to be sold. (*See* Doc. 35, Trial Tr. 671-72; Ex. 31). Petitioner began the conversation by stating

to Carr that "what you wanna do [is] have my man drive it." (Doc. 35, Ex. 31, line 14). Carr balked

at that suggestion, and proposed instead to take petitioner to his home to wait while he "dump[ed] these

two for you real quick now" at a profit. (*See* Doc. 35, Ex. 31, lines 17, 24, 28, 34-52). At that point,

petitioner's companion asked Carr if he was prepared to "rid[e] ... right now, right this second, wit[h]

it." (Doc. 35, Ex. 31, line 53). When Carr responded affirmatively, petitioner's companion stated,

apparently to petitioner: "You want to use his driver or our driver it's up to you. I feel safe man."

(Doc. 35, Ex. 31, lines 54-55).

Petitioner, however, expressed some doubts about Carr's proposal, pointing out that "this ain't

no situation that be happening every day" and that he would prefer to either have his driver or himself

accompany Carr to Dayton rather than wait. (Doc. 35, Ex. 31, lines 57, 59). Carr responded negatively

to petitioner's proposal and indicated that petitioner "can't complain" because Carr had already made

arrangements to sell the cocaine costing $21,000 per kilogram for $23,000 per kilogram and to bring

back to petitioner the $46,000 earned from the sales. (*See* Doc. 35, Ex. 31, lines 60-88, 169-170; Trial

Tr. 671).

The conversation continued without any agreement reached about how the transaction should

proceed. (*See* Doc. 35, Ex. 31, lines 89-188). At one point in the conversation, petitioner did make

certain statements about the cocaine he would be supplying, which Carr understood to mean that the

cocaine was of "good quality." (Doc. 35, Trial Tr. 680; Ex. 31, lines 125-131). Moreover, petitioner

told Carr to "[m]ake this shit happen smooth[;] I don't want to have no kinks.... I can't afford no kinks

right now." (Doc. 35, Ex. 31, lines 153-155).

Carr testified at trial that petitioner and his companion did agree to follow him to Dayton where

the cocaine provided to him was to be sold. (Doc. 35, Trial Tr. 671-72). At the close of the

conversation, petitioner's companion indicated that he was not feeling well, and Carr and petitioner

agreed to postpone their dealings until the next morning. (Doc. 35, Ex. 31, lines 172-176, 188-213).

Ingram testified that the investigation concluded at that point because petitioner "wanted the money up

front," and the way the transaction was set up, Ingram would have had to authorize that $46,000 be

taken to Dayton, an area outside of his jurisdiction. (Doc. 35, Trial Tr. 715).

Viewing all this evidence in the light most favorable to the prosecution, a rational juror could

have inferred, and not merely speculated, that the trafficking offense committed by petitioner involved

two or more kilograms of cocaine and that, therefore, petitioner was guilty of a first-degree felony and

MDO offense under Ohio Rev. Code. § 2925.03(C)(4)(g). Although a "close question" exists as to

whether the circumstantial evidence was sufficient to establish that petitioner had the cocaine offered

for sale in his possession to deliver to Carr at their final meeting, possession of the controlled substance

27

is *not* an essential element of the offense. *Cf. Pimental, supra*, 2005 WL 273009, at *4. As the Ohio Court of Appeals reasonably found, the amount of cocaine that petitioner offered to sell was "identified multiple times and was never less than two kilograms." (Doc. 6, Ex. 8, p. 4). Furthermore, as the Ohio Court of Appeals also found, petitioner represented to Carr that the cocaine to be delivered was not counterfeit and of "good quality." (Doc. 6, Ex. 8, p. 4).

Here, unlike the *Chandler*-line of cases, there is no evidence in the record even remotely suggesting that petitioner did not have any cocaine to sell, was incapable of procuring two kilograms of cocaine, or made false representations to Carr regarding the identity and weight of the substance offered for sale. *Cf. State v. Thompkins,* No. 92575, 2010 WL 193600, at *3 (Ohio Ct. App. 8 Dist. Jan. 21, 2010) (unpublished) (holding that there was no basis for finding that the jury's verdict was against the manifest weight of the evidence given that the defendant "offered nothing to contradict the [undercover] officer's testimony" that the defendant had repeatedly asserted to her that "he only sold genuine crack cocaine"). On the contrary, evidence was introduced that petitioner had been involved in the trafficking of significant amounts of cocaine for a number of years with connections to suppliers from Mexico and Los Angeles. Moreover, the evidence presented about the prior robbery of three kilograms of cocaine from petitioner, which led to Carr's involvement in the sting operation, supports the inference that petitioner was a cocaine trafficker, who had the means and ability to deliver on the offer that was made to Carr.

Finally, a reasonable inference could be drawn from the numerous conversations between petitioner and Carr that petitioner engaged in serious negotiations rather than mere "idle talk" in offering to sell at least two kilograms of cocaine to Carr as part of a plan to eventually be repaid for the the three kilograms stolen by Carr's cousin. As petitioner indicated in his final meeting with Carr,

28

petitioner could not afford to have any "kinks" occur in the plan that was negotiated between them after the loss of three kilograms of cocaine valued between $60,000-$63,000. Petitioner had a self-interested motivation to ensure that the cocaine delivered to Carr would be acceptable to Carr's customers and ultimately would result in Carr's full repayment of the debt owed stemming from the robbery committed by Carr's cousin.

Accordingly, in sum, the Court concludes that petitioner is not entitled to habeas relief based on his claims in the petition challenging the sufficiency of evidence. The Ohio Supreme Court has ruled that *Chandler* does not extend to require a showing of a detectable amount of cocaine in the substance offered for sale in cases such as this, where no controlled substance was recovered. Moreover, a rational trier of fact could have found beyond a reasonable doubt the essential elements of a first-degree felony cocaine-trafficking offense and MDO classification under Ohio Rev. Code §§ 2925.03(A)(1) and 2925.03(C)(4)(g), based solely on the circumstantial evidence that was presented at trial. Therefore, the Ohio courts' adjudication of the due process issue neither is contrary to nor involves an unreasonable application of the *Jackson* standard and was based on a reasonable determination of the facts in light of the record evidence.

## IT IS THEREFORE RECOMMENDED THAT:

1. Petitioner's petition for writ of habeas corpus (Doc. 1) be **DENIED** with prejudice.

2. A certificate of appealability should issue because the issues presented in the instant petition, challenging the sufficiency of circumstantial evidence supporting petitioner's conviction for trafficking as a first-degree felony and MDO offense under Ohio Rev. Code § 2925.03(C)(4)(g), are "adequate to deserve encouragement to proceed further." *See Slack v. McDaniel,* 529 U.S. 473, 475 (2000) (citing *Barefoot v. Estelle,* 463 U.S. 880, 893 & n.4 (1983)); *see also* 28 U.S.C. § 2253(c); Fed. R. App. P.

22(b).

3. With respect to any application by petitioner to proceed on appeal *in forma pauperis*, the Court should certify pursuant to 28 U.S.C. § 1915(a)(3) that an appeal of any Order adopting this Report and Recommendation would be taken in "good faith," and, therefore, should **GRANT** petitioner leave to appeal *in forma pauperis* upon a showing of financial necessity. *See* Fed. R. App. P. 24(a); *Kincade v. Sparkman*, 117 F.3d 949, 952 (6th Cir. 1997).


Date: *2/2/2011*

    cbc

Karen L. Litkovitz
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

OLIVER LUCIEN GARR,
    Petitioner

Civil Action No. 1:08cv293

    vs

Dlott, C.J.
Litkovitz, M.J.

WARDEN, MADISON
CORRECTIONAL INSTITUTION,
    Respondent

#### NOTICE

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).